Next matter is Depolo v. Board of Supervisors Mr. Hopengarten I cannot tell you how delighted I am to see somebody's first voting with an electronic gizmo as opposed to a stack of papers. Doesn't mean you're going to win, but it's a great way to start. Thank you, Your Honor. My name is Fred Hopengarten. I represent Jeff Depolo, the plaintiff. I'd like to reserve three minutes. Sir, in particular for myself, I cannot tell you how many times I've gone around and around and around on what I thought was a relatively straightforward case, and I'm still going around and around and around on it. How do you get here? Given Armstrong, how do you get here? Assuming there is no, and maybe you can take issue with this, no federal cause of action built into PRB 1, how do you get here? The same way that people in five other circuit courts have appealed. They all did for Armstrong though, weren't they? But Armstrong is a sole remedy case with an intent to foreclose, neither of which exists here. What do you mean by that? Under the Armstrong case, the majority opinion says that in the statute there is described as a sole remedy. Only the secretary can act. And in addition, the court found within the statute an intent to foreclose private rights of action. We don't have that here. And I guess we have to assume that before Armstrong, courts found jurisdiction under the Supremacy Clause. Yes. And Armstrong said you no longer can do that, but there is still an action in equity. As long as there is no other remedy, or unless, or as long as the remedy is not foreclosed, either by the statute or by the regulation, which doesn't appear to be the case here, and there is no other remedy that's available to the plaintiff in a circumstance like this. Am I accurately stating your position? I like your question. He said it was a position, your position. You said it was a question. I like the position as you say it. What about the language of PRB 1 that seems to suggest that the whole reason for PRB 1 is to set forth the, I don't want to use the term balancing because that's in dispute here, but set forth the relationships between the federal interest and the local zoning interest and to establish that there is in fact a federal interest that local zoning authorities must recognize and to enable persons in the position of your client to so inform, I think that's basically what PRB 1 says, to inform local authorities of that federal interest. But informing them of the federal interest is very different than relying upon that rule, if you will, or order that came out of the rulemaking process to do that also. Am I misreading PRB 1? No. On the PRB 1 we're allowed to inform people, but in addition to PRB 1, Ricardo stepped in and asks local authorities to understand that there is a federal interest in public law 43-108. So there's a federal concern here. We said that in Izzo. But what's the remedy? Let's assume you're right on all of that. What happens? If this goes back to the district court. Well, first of all, when it goes back to the district court, I'd like you to write an opinion which in effect echoes the laws of other circuits. I'm not asking for anything new. This just happens to be only the second time. What law are you talking about from other circuits? What cases? You've got here a local provision that says no more than 35 feet. Right. You've got a request for 180 feet. You've got the township giving a variance for 65 feet. You've got a situation where the township looks like it's attempting to reasonably accommodate, which is what PRB 1 talks about, and the FCC doesn't really want to get in the middle of that. They're saying that's why you have this general term, reasonably accommodate. Why are we supposed to say that what's happened here is not enough? A couple of reasons. Let's take what you've been talking about. First of all, you have a 35-foot maximum height, which is illegal on its face, a rule that's been stated by many circuits. We're talking about your case. I understand that, but my case has an ordinance with a 35-foot maximum. The next thing, which is the 65-foot number you mentioned, is really on the as-applied side of the case, and it still looks to be a firm, fixed maximum height now required. What did the township do that did not attempt to reasonably accommodate the concerns of the person making the application? Five circuit courts of appeal have found that you have to negotiate. We did. We said, if there's a discussion, one side puts forward a position, the other side puts forward a position. Arguably, I know you're going to say they didn't do much by going to 65 feet because state law required them to do that. They're going to say, look, we'll go from 35 to 65 feet. Now, you may not like the quality of that, quote, negotiation, close quote, but why isn't that negotiation? Well, it's certainly not a good faith negotiation when someone appears before a body acting in a quasi-judicial fashion. That's not a good faith negotiation situation. But more than that. What should they have done? This is part of what's troubling me, too. This is not a case involving absolutes. It's not a case where 65-foot antenna, you can reach 10% of the people you want to reach, 35% of the people, total blackout, you can't reach anybody, you hear the chipmunks next door, that's it. 180-foot antenna, you can begin to sign up with SETI. You can find out whether or not there may be evidence of intelligent life on Saturn. It's not that clear. We're talking about 40% reliability, 50% reliability, which seems to me greatly complicated. If they come forward with a proposal that moves from 40% reliability to reach parts of Europe to 50%, I'm not sure I have those numbers right, reliable reliability, you're saying that's not enough for 180-foot reliability. 180-foot is 60-foot reliability. Under any of this scenario, you don't have absolute certainty of communicating with the guy or the person or the lady at the opposite end of the radio wave. What is wrong with compromising down to 40% or 50% reliability? Well, first of all, the figures you're referring to from the case have to do with short-wave communications. And there's a lot of testimony which says at the microwave frequencies, which are the principal interest of the applicant and the principal use of the antenna support structure, there would be no communications because of blockage by the trees at microwave frequencies. This court has seen many times cellular telephone cases where people stand up and say, we just can't transmit through the trees at 1.2, 2.3, 5 gigahertz. Could he, though, reach with reasonable, and I don't know what number you want to put on reasonable, reasonable consistency and reliability, the folks he's trying to reach using only short-wave communication, not microwave communication. Is that in the record? No. Well, first we need to set, the answer is no. First we need to set it up. The FCC rule is that he's entitled to effective communications. And that backs us into what's perfect? We don't know what that is, but here's what we do know. That's not a commercial standard, which is often known as the four nines, 99.99% up time throughout the year. So it's going to be something less. And amateurs don't expect that kind of commercial standard. And I don't think this court should be in the business of saying that 68.2 or 77.1 is the right number. It's going to be a reasonable accommodation for effective communications that he or she desires. And this board can't tell him what he desires. This board can't tell him that he only desires to use short-wave instead of microwave. Well, I'm still, I don't think you've got a good facial challenge here because there is a, a variance is allowed. And so there is a mechanism in the law that allows for the reasonable accommodation to occur. So if we get to that point, you know, the question still remains, why wasn't it done here? And if there's a problem, then we would send it back. And we would ask the district court to do something. What is it we would ask the district court to do at that point? I would ask the, that's contained in our prayer, actually. I would ask the district court. I had trouble following all of your requests. And then, you know, and I realize you may want a broad decision here, but we. . . Should I address the variance question first? Yeah, sure. As to how it applies to the facial challenge. Yeah, a variance, looking at Brian on Pennsylvania zoning law, variance is not a solution to a defective ordinance. In addition to that, under Pennsylvania law, my guy. . . If I gave you a variance here for 180 feet, would that be a solution? Well, no one would litigate. . . We wouldn't litigate that variance, Grant. But. . . Yeah. . . I suspect someone else might help with somebody else's variance. So I don't know that that's a good answer here. Yeah, the neighbors would have a problem. The neighbors would probably do it. Yeah, it would be the flip side of the coin in terms of who litigates it. Well, let me just say I think that you have a tough road on that particular argument. So if we. . . You might want to go to the as-applied. Go to the as-applied. And the question, you're saying that they wouldn't negotiate. Isn't this evidence that we have before us on the record that, in fact, Mr. DiPaolo wouldn't negotiate? He wants 180 feet. I'm going to have a touchdown on a long pass, and we're not going to grind it out. I can tell you there are many things that could be put on the table if there were a negotiation, a good-faith negotiation. Is there any evidence that Mr. DiPaolo was willing to do less than 180 feet? Yes. And what was that evidence? He submitted a chart which said that there's a certain band of height necessary above the trees. He needs a certain amount of vertical real estate. And that could be accomplished with two towers, let's say, three feet above the trees on each. What's the height? What's that height? What is that height? Well, it could be a 140-foot tower and a 160-foot tower or two 150s. You know, the building, the courthouse here is 300 feet high. So you're looking for something that's two-thirds the height of the building. My problem is that he's on the wrong side of the hill. There are trees, terrain, buildings in the way. What about all the cases talking about these retracting antennas? Was that put on the table at all? I don't want to step into that rule. It's not our role to mediate it, but there's no mention here that I can see of that approach. You're having an antenna that's only X feet at a certain time, and then it's a lot less than that at other times. Why wouldn't something like that be a solution? Because his particular interest at microwave frequencies is in maintaining a network. You can think of it as somewhat parallel to an emergency communications or a cellular telephone network. It really needs to be up all the time. In addition, the kind of antenna that goes up and down that you will find the military and emergency communications people at the highest levels like the Pentagon using are monstrously expensive and fail the reasonable accommodation test. Let me ask you this. This is another thing that bothered me. This is one of the things that bothered me about this from both sides. If this were a straightforward case where you've got a hand-radio operator on one side of the equation embodying the federal interest that is pronounced in PRB1, and the other side you have, from your perspective only, and I'm not living it because of anything I believe, parochial NIMBY kinds of, in my view, I don't care what the federal government's interest is here. That's one thing. You've got the National Park Service and the Department of the Interior, which arguably are projecting a federal interest. They're lined up against you. What should we do with that? We've got PRB on one hand saying this is what the federal interest is, and in this case we've got the National Park Service, we've got agencies of the federal government saying we all want you to have a 180-foot antenna. I'd really like you to look at a map and see how far away that park is. This is going to be no more than a pencil line against the sky, and besides, nobody knows what a viewshed really means. I don't think they represent the federal interest, which the federal government has called a strong federal interest. In fact, there's another way of looking at it. I think you've got the specialized agency, the FCC, on our side, and the Park Service representing the effects of neighbors. You've got the FCC on your side? The FCC is saying, look it out. You have a reasonable accommodation. We're not going to give you anything black and white. It's going to be a lot of gray. No, I don't think that's exactly what the FCC says. The FCC says that the balancing has already been done, and we've found in favor of the radio amateur, and the obligation is on the part of the municipality to accommodate effective communication. In general, that's what the FCC is saying. In this particular case, that's not what the FCC is saying. They're saying this is the first case that they know of, the only case they know of, where the patent claim has been dismissed and a failure to state a claim under 12B-6. That is their concern. They're not concerned about the merits, and they say that. They just don't like the fact that it was to burn out under 12B-6, failure to state a claim. They may be concerned about the outcome, but that's not the stated position. The FCC in PRB-1 says local regulations which involve placement, screening, or height of antennas based on health, safety, or aesthetic considerations must be crafted to accommodate reasonably amateur communications and to represent the minimum practicable regulation to accomplish the local authority's legitimate purpose. So do what you've got to do to get there, but you don't have to go beyond it. And the question you're saying to us is 65 feet is clearly not enough, so what benefit do you get if it's more than 65 feet? How much additional benefit do you get? At 65 feet, he can't transmit through the house and the hill. I'm sorry, he can't do what? He can't transmit at microwave frequencies through the house, the trees, or the hill. Can he do shortwave frequencies through the house, the trees, or the hill? He could, but that's not the communications he or she desires. With the FCC interest, they're talking about the need for emergency interest where they've pronounced the importance of the ham radio operator. They don't distinguish between ham radios on shortwave frequencies and microwave frequencies. They're just concerned about radio waves and whether or not those radio waves that has given frequency X shortwaves or frequency Y for a different kind of transmission is not their concern. They're concerned about the fact of transmission. In no way would it be a wonder they just start distinguishing between microwaves, like the kind of distinction that you're making. The FCC's specialized agency has long recognized the differences in height requirements for various frequencies. That's one of the reasons that you have these thousand-foot towers in the Roxborough Antenna Farm. They know the difference. Those are all commercial broadcasts. Roxborough Antenna Farm is all commercial before nines. That's what's at play there. That's also correct, but you'll notice that it didn't make the neighborhood unlivable. There are thousands of homes surrounding them. Let's assume that we don't buy your opponent's claim preclusion or issue preclusion arguments. Let's assume that we do not grant you the 180 feet, and let's assume that we do not direct the district court to grant the 180 feet. What do we ask the district court to do in that case if we send it back? I think you ask the district court to follow the rules that have been established by five circuit courts of appeal, which include this requirement for negotiation. And for a fair hearing, this case had a situation where the Board of Supervisors directed the ZHBA to only apply local zoning law and to ignore federal and state law. Does the district court send it back to the township, the Zoning Hearing Board? You know, I think that might be futile, frankly, given the level of opposition. Well, maybe not, but is that something, is that a possibility here? Since we've had so many nights of hearings and we have this expressed opposition, I can see it as a potential remedy, but boy, that's an awful remedy that fails at minimum. That's the nature of zoning changes and variances. The problem is if you go back with the same zoning law, you still have the facial claim of 35 or 65. They don't have a new zoning ordinance that even specifies 65. We dealt with that. The point is you do have the ability to have a variance. We don't think that it's really a proper solution to a defective ordinance. Every time I've ever dealt with something that if you have X and you can vary it to have X plus or X minus, isn't that a way out of Dodge? I don't think, frankly, I get really concerned that he may be ineligible for a variance under Pennsylvania law, the criteria. Okay, so you think he may be ineligible, but they're offering you a 30 additional feet. Is this court willing to endorse an improper method of resolution? If it's improper. If it's not, maybe not. We wouldn't go that far then, would we? I mean, that's what we're talking about. Is it proper or improper? I think variance is an improper solution. I mean, you put the cat in the hat and I'm not sure it's there. I think variance is an improper solution. Except if you go back to Judge Engel's prior question, if you've got a 180-foot variance, you'd have no problem with that improper solution. Well, I wouldn't litigate it, but I think somebody else would. Right, but you would have no problem with that improper solution. I would have no problem. I'll smile. Let me come back and we can round this up because I'm not sure I'm any clearer here than I was when I came out. But if 180 feet is optimum according to your client, and 65 feet, what you said is not optimum, it's sufficient. Okay. It's sufficient, but we could get these in several different ways. Okay. But let's forget about the multiple towers because I'm sure the neighbors are not going to be happy with two, from their point of view, ugly structures as opposed to one, even if they're both shorter than the one. We could also move it around the lot because he's put it way downhill. Which means it's going to be higher. If it goes further downhill, it would be higher. If it goes further uphill, where it would be more visible to the neighbors, it would be shorter. Okay. Back to the question. Let's assume that 180 feet is the amount of the tower that is acceptable. I'll take a word out of it from your perspective. And 65 feet is the height that is acceptable from the pound perspective. For every increment of footage that you go up, you get a little bit, I'm assuming, you get a little bit more efficiency and effectiveness for both microwave and shortwave communication. No. That's not true. Correct. It's like quantity. If it's microwave, you've got to be over the treetops. 65 feet does not get you over the treetops? That's correct. Okay. How high does it have to be to get over the treetops? About 100. Well, 100 is the height of the trees. 101. It doesn't give us enough vertical space for all the antennas proposed. We need that band of space above the treetops. How much vertical space above the trees do you need? Well, in cellular telephone, you see all the time situations where every carer wants to be above the treetops. Is it reasonable to ask that some of the trees be cut down on the part of the township? You could ask that, and my guy would be willing. But I don't think the neighbors would be pleased. Or just top them. There was a problem with DirecTV. I couldn't get my Sunday ticket. Unless they topped some of the neighbors' trees. So you shouldn't be watching the TV when you're watching the Browns. That's true. It's not even football. So I just moved the antenna, put the antenna out on the lawn and got a better angle. And now we're involved in trying to mediate. Let's hear from Mr. Larkin and Ms. McGuire after. Maybe they can shed some light on this. Good morning, Your Honors. My name is John Larkin. May it please the Court I represent the zoning hearing board of the different township, but I'm also going to be speaking on behalf of the intervenors, both the individual intervenors and Schuylkill Township. Could you address how correct it is that there was a refusal to negotiate on behalf of the township? There are two different issues there. First off, number one, it's simply not true that the township absolutely refused to negotiate. I want to draw a distinction between the Board of Supervisors, which does not oversee, which does not take appeals from, and which does not give instructions to the zoning hearing board. They are purely a party. So the only people who have any capacity to negotiate here is the zoning hearing board. That's my client. What we tried to do in order to negotiate was float an option for a variance of 65 feet. We will give you a variance from 35 up to 65. Doesn't state law require 65 anyhow? It does not, Your Honor. The reason why not, Your Honor, is there's an exception that says although there's a 65-foot state minimum, in areas that have special historic or architectural characteristics, that minimum is gone. There's an exception. Mr. DiPolo's property is in the R1-half zoning district in Tredyffrin, and it's specifically zoned to protect the historic character right next to Valley Forge National Historic Park. So the 65-foot minimum does not apply where Mr. DiPolo lives. So we are not in violation of state law with this ordinance as against Mr. DiPolo. No, I wouldn't agree with that. What about just the fact that you have a fixed-height limitation with no exception for short-wave communication? Why wouldn't that on its face be in violation of the policy in PRB 1? Well, as Judge Ambrose has noted, we self-evidently don't. We have a mechanism to alter the height ordinance, which is 35 feet, and that's by means of a variance, which is exactly what we did. Okay, but I think that's Mr. Hoppengart's concern, that the variance requires a real hardship on the part of the property owner, doesn't it? He was apparently able to get it in this case. I don't know what hardship it is that he articulated, other than he believes that under the FCC regulation he is entitled to a reasonable accommodation. And in this case, he got it. So he can't really complain that he is in a reasonable accommodation. It's an issue about whether or not it's a reasonable accommodation. If it's accommodation, he's arguing it's not a reasonable one. Well, that takes us to the second issue, Your Honor. The FCC regulation does not require us to accommodate him beyond the ordinance. The FCC regulation on its face says that the ordinance itself must reasonably accommodate him. Also, it's got to be the least restrictive of the policy, but the restriction has to be the least restrictive in terms of its impact on ham operations, doesn't it? That's true. In this case, the ordinance is set at 35 feet as the starting point, which has been deemed to be reasonable by other circuit courts, and there's also a mechanism to vary that. So the ordinance itself does not create a fixed height, so it's therefore by definition the minimum necessary regulation. It starts with a number from which we can move on. Are you saying that the variance cannot go higher than 65 feet? Not at all. The variance could be up to 180 feet. In this case, that would have been unreasonable given the placement of the home, obviously 180 feet. It's 190 feet with the antenna. That's higher than we are now, or about where we are now, I suppose, on the 19th floor. That's a very tall tower to have in your backyard. I'd like to also address the issue that was brought to our attention by the court, which is the Armstrong case. In Armstrong, the Supreme Court pointed out that if there is no express private remedy that's created by the federal law, then there is no legal remedy, no legal right of action at law. The only authority that the courts would have to address preemption claims brought by a private individual would be through equity. The court then went on to say that equitable remedies can be impliedly foreclosed if there is, A, on the one hand, an alternative remedy that is available that is not a private remedy, and, 2, if the regulation at issue is so complex as to be judicially unadministratable. I think that we all agree that in this case there is no express private right of action in either the Telecommunications Act or the federal regulations that interpret it. And no express provision that forbids? That is also true. All right. My reading of Armstrong did not include an express provision that would have foreclosed the private remedy, however, which is why the court then turned to the question of whether it was impliedly foreclosed. And in that case, in Armstrong, the court noted that the Secretary of Health and Human Services was the party that was vested with the authority, and therefore there was an implication that there was no private right of action. In this case, 47 U.S.C. Section 401 sets forth the mechanism by which the FCC is supposed to create remedies. It is the FCC, when there has been a violation of a chapter, is to go to the Attorney General, who is then obligated. It's a mandatory construction. The Attorney General shall take the case to the district court. And the only remedy? Do you really think that Congress had in mind the Attorney General of the United States going into townships where there's a zoning dispute between hand-radio operators and his or her neighbors, and you want the Attorney General to get involved in that kind of dispute? That is the exact same question that the court was posed in Armstrong. Because Justice Scalia writes for the court. It's a very different statute. It is, but Justice Scalia noted that in that case, in order to remedy what was a relatively small defect in the pricing scheme, the only remedy would be for the Secretary of Health and Human Services to turn off Medicaid to the entirety of the state. In spite of that, he said, if that's the remedy that Congress has created, then that's the remedy that you're going to have to live with. In this case, the FCC gets to make a discretionary decision whether they want to intervene or not. They're vested with that authority. If they decide, yes, they want to do that, there is a federal interest that they claim impacts emergency services. If that is true, they can go to the Attorney General and they can instruct the Attorney General to intervene. There is not, however, a private right of action that is created by the statute that allows us to function as private Attorney Generals, as it would be if this were, for instance, a False Claims Act issue, where you can go in on behalf of the federal government. So as a result, in this case, we've checked off two of the boxes. There's no private right of action that's expressly created. There is an alternative remedy. The only remaining question is, is the federal regulation at issue judicially unadministratable? And that term is an important one. It's distinct from unenforceable. By definition, all laws have to be— How is the requirement here judicially unadministratable? In this case, we're trying to deal with the FCC regulations as they are going to be dealt with by the state law that deals with zoning boards and then also the local ordinance as applied across all the various different municipalities in Pennsylvania. So you've got such a multiplicity of different ordinances, laws, and regulations that it becomes unadministratable. And I really want to distinguish between the difference between unenforceable and unadministratable. The federal courts do not exist in order to administrate the FCC. Certainly, if the attorney general were to properly bring this case before the court, this court would be charged, the district court would be charged, with determining and enforcing what the FCC laws are. But in the first instance, this is not the place where plaintiffs go to resort to administration. It is unadministratable. What have other circuit courts decided on this issue? Well, as the panel has noted, other circuit courts have not had the benefit of the Armstrong case. As a result, they have always found jurisdiction under just the general supremacy clause of the Constitution. So this would be the first time that this particular issue was dealt with in the context of the FCC and private towers. I see that my time is running short. I want to address one additional issue, which deals with how the other. Let's go back to that. Isn't there an equitable cause of action? The equitable cause of action only remains if, number one, the regulations at issue are not judicially unadministratable, and two, at the same time there is not implied foreclosure of that equitable authority by the creation of an alternative remedy. So in the Armstrong case, the court noted that the Secretary of Health had the authority to intervene, as a result, impliedly foreclosing the private right of action. Here, because the FCC has a far less drastic even solution, it can come in and request a writ of mandamus. There is the similar implied preemption. But the relevant statutes here don't seem to indicate that Congress intended to preclude equitable relief. The implication here, as in Armstrong, would be that the preclusion of equitable relief is accomplished by creating an alternative mechanism without at the same time providing for a private remedy. Did Congress specify a single remedy for violations of Section 9715? It specified a single remedy for all violations of the chapter. And what is that remedy? It is for the FCC to go to the Attorney General and instruct the Attorney General to file the identical case that we have here with a different party as the plaintiff, the Attorney General, requesting a writ of mandamus. Let's assume that would happen. Let's put it in a parallel universe and assume that we're living under the law that you just suggested. Let me go back to Judge Strzok's question. Then what would happen? The Attorney General is here making exactly the same arguments that Mr. Harpengarden is making. What happens if the case goes back? We're left with two different problems. The first is the one that was found by the district court, which is that there was absolutely no attempt to negotiate by Mr. DiPolo. I heard a moment ago that Mr. DiPolo was, in fact, open to negotiation, but this is the first time we have heard that at all. If you look at Paragraph 28 of his ‑‑ That's good. We're making progress here. We are. Paragraph 28 of the complaint very clearly says that the minimum height that he's willing to accept is 180 feet plus a 10‑foot antenna on top, which means that what the district court had before it was a circumstance where the plaintiff very specifically said, I will not negotiate. But that's what negotiating means. Every time a settlement discussion happens, it happens with both sides saying, this is what I want, this is the minimum I will accept, I won't accept anything less, and then people start to talk. And he was made an offer by the zoning officer, which was, I will give you 65 feet instead of 35. That was before we got involved as the board. The zoning officer said, I will give you 65 feet, to which his response was, absolutely not, I'm going to the zoning board. And he said, I need 190 feet. And there's actually a section of the transcript where one of the zoning board officers starts asking the questions. Well, what if you had 90 feet? What if you had 120 feet? And it's the same questions that this panel was asking a moment ago, which is how much more would you get for each foot, trying to figure out what the reasonable accommodation would be. The answers that they received were basically the same ones we heard right now. It has to be 190 feet. He needs 190 feet because he can't accomplish the goals that he has set for himself. And really what has happened is... And those goals are microwave as opposed to shortwave? That is what he says now, yes. But the problem which you articulated is a good one, Your Honor, which is that if he were to say, my goal is I want to participate in the SETI program, because I'm an amateur astronomer, and I need the Arecibo Observatory in my backyard, according to his reading of the statute, there is absolutely nothing that we could do other than accommodate him and say, yes, go ahead, build the dish. What if he were correct about the procedure here, that he should go to the FCC, and the FCC would petition the Attorney General, and we'd be back on a writ of mandamus. Writ of mandamus means there must be an indisputable right and remedy. So what would be the remedy? Granting the 180 feet. No negotiation at all. The courts that have sent the matters back to the zoning board have uniformly, or almost uniformly, I should say, asked that the zoning board not necessarily grant the application as it was put before it, but go back and negotiate. The reason why is because in those cases there had been no attempt at negotiation, Pentel being the foremost of them. In the Pentel case, we were told very specifically, it cannot be the law that you get any height that you want, but you have to negotiate and try to reasonably accommodate. But you're saying that Armstrong forecloses that as a remedy. Armstrong forecloses that as a remedy if this is a private plaintiff case, in the alternative universe where the Attorney General has. That doesn't seem to me to be a remedy if it's back on mandamus. That's a yes or no situation with mandamus. I understand what you're saying. I agree. I see that as a problem. The writ of mandamus, I suppose, could be to instruct that you would hold a hearing at which negotiations could occur, because, again, in those cases there was no hearing in the first place. You're weakening your argument. I don't want to do that. How is the concept of a reasonable accommodation judicially unadministratable if equitable relief, such that equitable relief is unavailable? I mean, courts, this may be complex, but courts have handled these issues time and again. I don't understand how it's not. It's unable to be administered in a court action. And I think that the distinction that Justice Scalia was trying to draw, Your Honor, was between enforcement and administration. This court, the district court, does not have the capacity to function as the FCC, and in every single case hear the complaints that would be brought. But, yeah, and the FCC and PRB1, we do not have the staff or financial resources to review all state and local laws that affect amateur operations. That suggests that the FCC did not discern any congressional intent that the agency and not private individuals could seek to have a court rule on preemption issues. I tend to agree. However, the FCC determination was well before the Armstrong case. But that doesn't change what they said. I mean, what they said in the PRB1, it's not changed by the fact of what Scalia said in Armstrong. That's true. But then you get back to the problem that PRB1 does not impose an obligation on townships to negotiate. That is entirely a creation of the Fourth, Tenth, and Eighth Circuit Court decisions in Williams, Evans, and Pentel. The specific language of the FCC statute, as you quoted, Judge Ambrose, was that the ordinance itself must reasonably accommodate. And in this case, we have a 35-foot maximum, which we granted a variance to 65 feet. Thirty-five is a number that circuit courts have agreed is reasonable in the past. Sixty-five feet is the state law minimum across the board, not in historic districts, as is this. So we went to the state law minimum. We gave more than we were required to. Is it a minimum or a maximum? It is the state law minimum. What do you mean it's a minimum? I can't go higher than that. I'm sorry. It is the minimum that we are permitted to restrict ours to. Okay. So it would be the maximum height that we could restrict is the minimum. I'm going to come back to where we started. So what negotiations so far have taken place by those parties that are able to negotiate? There are three different attempts at negotiation. The first is the zoning officer who said, as a compromise, I will give you the 65 feet. That was rejected. Mr. DiPolo initially wanted 190. He took an appeal. He said, I still want 190. Before the zoning board and at the zoning board hearing, there was an interchange between Mr. DiPolo and members of the board where he was asked questions. We're trying to figure out exactly what a number would be reasonable. I want to take a step back while I'm on that point and just point out, as a quasi-judicial body, we have a real problem with direct negotiations. We can try and broker a settlement. We can try and figure out what a reasonable variance is. But we don't have the authority to come off the bench and in private, ex parte, ultra viris, have a negotiation with one party without the other people in the room. So what we're trying to do is this kind of with a push and a shove, we're asking, let's see if we can broker a deal. Is 90 feet okay? And the answer that we keep getting is no, it has to be 190. Then the third and final attempt at negotiation was we were told, or rather we said, we will grant you a variance. After he had withdrawn his request for a variance, he said, I don't even want to talk about it. I get the sense that you guys are willing to give me a variance. I don't even want to talk about that. I'm withdrawing my request. You no longer have a mechanism to give me anything but what I asked for or the minimum. And in spite of that, the township zoning hearing board decided I will give you that 65 feet, to which he responded by filing a federal complaint, again demanding the 190, and specifically saying in paragraph 28 of his complaint, I will not accept less than that. That is the minimum. Is it 190 or 180? It's 180 is the tower plus 10 is the antenna. Okay. Thank you. Your Honors, I see my time has expired. Unless I can answer more questions, I'm happy to sit down. No. I don't have any questions. Thank you. Before you come up, Mr. Bright. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Maureen McBride on behalf of the Board of Supervisors of Tredyffrin Township. I'm just going to speak briefly on the one issue which Mr. Larkin, I thought, did a great job addressing, and that is the interplay between the Board of Supervisors and the zoning hearing board. The Board of Supervisors doesn't have the ability or the authority to direct the zoning, the ZHB, to do anything or to approve anything. What role does it play? I'm sorry? What role does it play then? It's a party. The Board of Supervisors is a party. But the request for relief. So as a party, can it negotiate with Mr. DiPaolo? Well, the issue with respect to negotiation is that, yes, the Board of Supervisors was agreeable to the 65-foot variance. So my question is, can it negotiate with Mr. DiPaolo? It can negotiate with Mr. DiPaolo, but not once it's before the ZHB. It can't direct the ZHB to do anything. Understood. But it can make a recommendation, could it not? Agreed. Agreed, Your Honor. And now it's not before the ZHB anymore. Right. It's no longer before the ZHB and hasn't been appealed to the Court of Common Pleas. The other issue I just wanted to address briefly, which was a point that Judge DelZell raised or addressed in his opinion, which is that before you even look at what the ZHB or the township was willing to do in terms of compromise, it's clear, and we've heard a couple of times about Paragraph 28 and the request for relief, it's clear that Mr. DiPaolo was not willing to compromise. So he wasn't willing to come not halfway, but anyway, to meet the township or agree to a compromise. He rejected the variance. And the issue about whether the variance was proper or improper, in my view, is moot because he rejected it. And the issue isn't he was granted a variance but doesn't think that it's appropriate. He rejected that. We're on a very different footing now because no one in this room, including many of us, knows how this is coming along because we haven't conferenced it yet. But if we were to conclude that either there's no probable cause of action or that for whatever reason the 65-foot variance that was granted is all that he's entitled to under the federal interest as expressed in PRB 1, then whether he wants a 180-foot tower is irrelevant. On the other hand, if we were to conclude that Armstrong does not preclude this action using the kind of format that was suggested in Judge Strickland's earlier question to Mr. Hoppengarden, and to conclude that given the nature of the federal interest, assuming the record supports this, that given the need for the microwave transmission as well as the shortwave transmission, 180-foot is what is required and sent it back with instructions for the district court to amend with that, then that gets into some procedural issue. But if that were to come out of it, both sides are in a situation that depending on what we do, one side is going to be really, really miserable with the decision. So it strikes me that the fact that one side or the other may not have been willing to negotiate before, that was yesterday, and today could be a very, very different day because we've already crossed that bridge. But we've had five days of hearings and the proceedings before the ZHB, which he has not appealed to the Court of Common Pleas. So he had his opportunity to negotiate or to breach compromise. I understand. But in our record, given the expert witness that he called, that would be sufficient testimony to support a finding that 180 feet, given the percentages involved, was the minimum necessary to support a reasonably effective system of microwave and shortwave communication. Well, we have other parties, though. As you mentioned, the Department of Interior and other neighbors who have interests in that. And right now, the only decision has been that it's been 180 feet, it's been his request, and that anything less than that, he's rejected. Now, if this Court were to hold that 180 feet is the minimum, there are other parties who would be intervening, I assume, the Department of Interior to contest that because that's not where we are today. I can't do that now. I just don't know. Whether or not they could appeal our ruling, I just don't know. I would doubt it very much. Okay. Thank you. Thank you, Your Honor. I totally usurped your three-minute discussion with my hypothetical question. Anything else you wanted to say? No, Your Honor. All right. Okay. I just wanted to address a couple of our issues. Mr. Hogan, if I can ask you some procedural questions. The Board took evidence. It made findings of fact, and it issued an opinion with reasons. What else would the Board have to do for its factual findings to have preclusive effect? Negotiate. There has to be negotiations somewhere. You didn't appeal that, did you? You wanted to challenge the Board's findings. You had to appeal it to the Court of Common Pleas, did you not? We're not. We didn't take an appeal because we believe our situation is where you attack the statute, but the ordinance, when it's written and it's applied, you can go to federal court. It's the plaintiff's choice. We chose not to go to Pennsylvania. We chose to go to the federal court system. But if you didn't appeal the – if the Board takes evidence, makes findings of fact, and you don't appeal it, aren't you stuck with that? Our claims really aren't based on the findings of fact. They're an attack on the ordinance as written and as applied. Time out. You said that the mistake that they made was they didn't negotiate. They made findings of fact that 65 feet was enough, and you didn't attack that fact that it was not enough. I mean, you attacked it during the hearing, but you didn't appeal it. To do so would put us in the state court system and preclude, frankly, our attempt to get to a federal court. We are going to the federal court claiming that somehow that there is preemption and because in some cases in other circuits, like the 4th, the 8th, the 10th, et cetera, some people have not been dealt with in a way that was perceived by those circuits, to be fair. But here, you're claiming somehow that, hey, 65 feet isn't enough. And yet, I'm lost. I don't understand. You're saying if you appeal to the court of common pleas, you're precluded from filing a federal claim? I would believe so, Your Honor. You can't go one way with respect to your proposal. You mean there might be claim preclusion if the zoning hearing board has been reviewed by a court as opposed to an administrative body like the zoning hearing board. Correct. That would be sufficient. That would be a good argument for claim preclusion. Had we gone to common pleas, I believe we would have been precluded. If you don't appeal, we've held that state quasi-judicial entities such as the zoning hearing board basically have the same, their findings are entitled to the same deference that the court would be. If you don't appeal that, the ZHB, the quasi-judicial agencies' findings, why aren't you still stuck with the same quality of preclusion that you would be had you gone to court and appealed a judicial finding? I'm having a hard time figuring out how a zoning hearing board can rule that it has acted correctly in an as-applied situation. I don't think they can preclude that claim. Because their ruling is based upon certain findings that have not been challenged by appeal and therefore they become basically a final order. I think that that's a matter of law that can be reviewed at the federal court level. The as-applied thing can be reviewed. That's the question. Let me go back to, how do you distinguish the crossroads decision from our court in 1998? I can't address it for you. I'm unfamiliar with it. It says, quote, unless a federal statute specifically indicates that state agency decisions should not be considered conclusive, factual findings of state agencies should be given the same preclusive effect they would be accorded in the courts of that state. Is that what I was referring to in my question? I mean, even if we agree with you, aren't we stopped by that decision? In a 12B6 case? There have been no findings by the opinion below because there was never an answer, never a hearing. All matters in the... There was a hearing. There were five days of hearings. Is there anything in the federal statute that says that the state agency conclusions or findings of fact should not be considered conclusive? I know of no conclusion. I just don't know that area. I'm sorry. Well, he just read it to you. Factual findings of state agencies should be given the same preclusive effect they would be accorded in the courts of that state. It said the same thing in the later case of Ridley School District. I guess my point is that we're not arguing findings of fact. We're attacking the ordinance, which is a matter of law, clearly within the province of the federal courts to rule on, and that's applied clearly. Well, I mean, if you can go further, I mean, we have an Edmondson case from 1993 in which Judge Becker wrote that unreviewed findings of fact and conclusions of law may, under appropriate circumstances, have preclusive effect. Now, one could argue that that's going quite a bit further, but, hey, you've got to be able to distinguish that case, Edmondson. You've got to be able to distinguish, for sure, Crossroads. If you're asking for a letter of relief, I'd be happy to provide one. You may want to submit something then, and you may want to submit. You want to submit it at the same time, Ted, or? Yes, yeah, the same time. How about five pages, no more than five pages? No more than five pages. Please, no more than five pages. May we contact the clerk to get full citations? I'll give you the right now. Crossroads is at 159 F3rd, page 129, and the quote is on page 135. And Edmondson, E-D-M-U-N-D-S-O-N, is from 1993, and it's at 4 F3rd, 186. Also at the Liberty School District, that's at 680 F3rd. The BIM site is at 283, referring to Crossroads. We'll check that out, obviously. Quickly, and I'll be very brief. It's been claimed to me that this is the longest statement in the world with the prefix, I'll be very brief. The Deacons could have started the Jardais with, I'll be very brief. That was in Gleek House. It's been claimed to you today that this is in a special district. The Jardais was in Gleek House. It's been claimed to you today that this situation is in a special district. I suggest that the town of Tredyffrin knows how to create special districts and overlays. This is not one of them. Second, I do not believe that there is a single remedy for all portions of the Communications Act of 1934. For example, in the OTARG rule, which is satellite dishes and the like, there's one kind of a remedy specified, cellular telephone. They have that special fast pace under their regulations. It's not a one-size-fits-all remedy. And thirdly, there were no findings on the question of negotiation by the judge. We arise here on a 12B6 where no answer has ever been filed by the defendants. All assertions of the plaintiff must be accepted in a light most favorable. I think you were taken there under advisement. Thank you. We'll take a brief break before the next case. But let me see counsel, all counsel involved for a second.